QUINN EMANUEL URQUHART
& SULLIVAN, LLP
 Adam Wolfson (Bar No. 262125)
 adamwolfson@quinnemanuel.com
 Stephen A. Broome (Bar No. 314605)
 stephenbroome@quinnemanuel.com
 Kevin Teruya (Bar No. 235916)
 kevinteruya@quinnemanuel.com
 Valerie Roddy (Bar No. 235163)
 valerieroddy@quinnemanuel.com
 Lauren B. Lindsay (Bar No. 280516)
 laurenlindsay@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

KELLER POSTMAN, LLC
 Warren Postman (Bar No. 330869)
 wdp@kellerpostman.com
 Ashley Keller (pro hac vice forthcoming)
 ack@kellerpostman.com
 J.J. Snidow (pro hac vice forthcoming)
 jj.snidow@kellerpostman.com
 1101 Connecticut Avenue, N.W., Suite 1100
Washington, D.C. 20036
Telephone: (833) 633-0118

BARNETT LEGAL, PLLC
 Jay W. Barnett (pro hac vice forthcoming)
 jay@barnettlegal.net
3404 NW 135th Street
Oklahoma City, OK 73120
Telephone: (405) 456-9343

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| EMMA DAWSON, MICHAEL DAWSON, LUIZ FILHO, ALKA GAUR, DAMIAN REYEZ JAQUEZ, YOLISA MKELE, and FERNANDA TATTO, on behalf of themselves and all others similarly situated<br><br>      Plaintiffs,<br>v.<br><br>META PLATFORMS, INC., and WHATSAPP, LLC,<br><br>      Defendants. | Case No. 3:26-cv-0751-RFL<br><br>**CLASS ACTION**<br><br>**DECLARATION OF SETH JAMES NIELSON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS PURSUANT TO RULE 11 OF THE FEDERAL RULES OF CIVIL PROCEDURE** |

I, Seth James Nielson, declare as follows:

1.      I am the Founder and Chief Scientist of Crimson Vista Inc., a cybersecurity firm based in Austin, Texas. A copy of my CV is attached as **Exhibit A**.

2.      I have been retained by Plaintiffs Emma Dawson, Michael Dawson, Luiz Filho, Alka Gaur, Damian Reyez Jaquez, Yolisa Mkele, and Fernanda Tatto ("Plaintiffs"), to provide analysis in this case.  I have personal knowledge of the following facts and, if called to testify, could and would testify completely thereto.

3.      I have reviewed Defendants' "Motion For Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure," including its assertions regarding Plaintiffs' allegations.  My overall reaction to the motion is that it either very carefully uses certain wording to provide an incorrect picture of the cryptographic landscape, or that it reveals a persistent misunderstanding about several key concepts.  Either way, I provide this declaration to explain why, from a cryptographer's perspective, there is no obvious technical reason to disbelieve Plaintiffs' claims. If the whistleblower testimony underlying the case is correct, there are numerous technical ways Meta and WhatsApp could obtain access to WhatsApp users' private messages.

4.      As an initial matter, Defendants devote a substantial amount of space to discussing "end-to-end" encryption.  The term "end-to-end" encryption has a very specific meaning for cryptographers and security experts. I find from my personal experience, however, that lay people often do not understand this meaning and instead believe that "end-to-end" encryption means "nobody can read my messages anywhere." Defendants' motion seems to imply that meaning, but it is not accurate.

5.      End-to-end encryption has to do with the movement of data through any processing systems until it reaches its final destination.  This is sometimes described as "data in motion." End-to-end encryption ensures that the data remains protected and secure while "in motion" and that no intermediary systems can read or interpret the data during that movement.  If WhatsApp's end-to-end encryption is as Defendants describe, then a way to visualize it is as follows:



6.      When Defendants refer to their end-to-end encryption, the standard cryptographic meaning is that data in their system cannot be read as it is transferred across the Internet.  Some metadata, however, must not be encrypted.  For example, the recipient must be knowable; otherwise, the system cannot route information to them.  Conceptually, it is like the difference between a physical envelope and the letter sealed inside it.  The sender and recipient on the outside of the envelope might be readable, but the contents of the letter inside are not.



7.      While end-to-end encryption is very powerful, there is one significant problem in terms of ensuring the security of the data: the data is not encrypted at the origin or the destination;

DECLARATION OF SETH JAMES NIELSON – Case No. 3:26-cv-0751-RFL

only the path in between.  When the user types in their message on their phone or computer, the message is inserted into the WhatsApp software in a completely unprotected (unencrypted) form. It is only encrypted shortly before transmission; meanwhile, the WhatsApp software has complete access to the unencrypted data.

8.      Similarly, when the encrypted message arrives on the recipient's phone, it is decrypted and displayed on the screen.  The WhatsApp software has access to that decrypted message as well.  Visually, the below demonstrates how to conceptualize when end-to-end encrypted messages are and, just as importantly, are not, encrypted.



9.      Although the message may have been encrypted throughout every intermediate transmission on the Internet, including WhatsApp servers, it is decrypted for the WhatsApp software at both ends of the communication.  And the WhatsApp software, which is written and controlled by Meta, is in between the phone and the User.  The software is completely capable of intercepting the decrypted data before the user ever transmits it (on the sending side) or reads it (on the receiving side).  End-to-end encryption during transmission/reception does not prevent the WhatsApp software from transmitting the decrypted data to Meta servers.

10.    In fact, the WhatsApp application explicitly includes a feature showing how it can send unencrypted messages to Defendants' servers.  A user can report abusive messages to Meta and transmit the decrypted messages (including the last five messages in the chat) from their phone to Defendants for review.  The option looks like this in the User Interface:



11.    In this example, WhatsApp is asking for permission before sending.  There is nothing, however, about end-to-end encryption as a technology that prevents the WhatsApp software from sending this same information, or any other decrypted information, back to Defendants without the User's consent.

12.    Notably, articles Defendants cite in their motion agree with my points.  For example, Defendants cite a public blog post from Dr. Matt Green, a cryptographer at the Johns Hopkins University.  I know Dr. Green personally and I know that he is a well-regarded applied cryptographer.  I have reproduced two key paragraphs from his blogpost below:

> In the case of WhatsApp, the application software is written by a team inside of Meta. This wouldn't necessarily be a bad thing if the code was open source, and outside experts could review the implementation. Unfortunately WhatsApp is closed-source, which means that you cannot easily download the source code to see if encryption performed correctly, or performed at all. Nor can you compile your own copy of the WhatsApp app and compare it to the version you download from the Play or App Store. (This is not a crazy thing to hope for: you actually *can* do those things with open-source apps like Signal. (https://github.com/signalapp/Signal-Android/blob/main/reproducible-builds/README.md))

The most important thing to keep in mind here is that Meta's encryption happens on the client application, the one you run on your phone. If the claims in this lawsuit are true, then Meta would have to alter the WhatsApp application so that plaintext (unencrypted) data would be uploaded from your app's message database to some infrastructure at Meta, or else the keys would. And this should not be some rare, occasional glitch. The allegations in the lawsuit state that this applied to nearly all users, and for *every message ever sent* by those users since they signed up.

13.     I fully agree with Dr. Green's analysis.  He explains essentially what I have explained.  Simply, if end-to-end encryption is applied correctly, the data is not readable while it is in motion.  However, it *is* readable on either end and, without access to the WhatsApp application software (which Meta does not make available for public review or audit), it is difficult to determine if Defendants' software allows them to transmit pre-encrypted or subsequently decrypted messages to Meta servers without User permission, as the whistleblower testimony claims.  Plaintiffs' current inability to analyze whether and how that happens, however, does not mean it is technically infeasible—quite the opposite.

14.     In this declaration, I have emphasized that "end-to-end" encryption, even if correctly applied, is no reason to discount the testimony of the whistleblowers. But it is still possible that end-to-end encryption ***is not*** correctly applied. For example, the keys to the encryption are on the phone and ***should not*** be with Meta servers. But it is technically feasible for those keys to be transmitted by the WhatsApp software to Meta for decrypting the messages. Again, Dr. Green notes the same thing in the citation above (e.g., "or else the keys would").

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2026.


_____
Seth James Nielson, Ph.D.